**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DE LA COMUNIDAD BILINGUAL CHARTER PUBLIC SCHOOL; DE LA COMUNIDAD INCORPORATED,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL J. MCKEE, in his official capacity as Governor of the State of Rhode Island, CHRISTOPHER R. BLAZEJEWSKI, in his official capacity as Speaker of the Rhode Island House of Representatives, VALARIE J. LAWSON, in her official capacity as President of the Rhode Island Senate, and COUNCIL ON ELEMENTARY AND SECONDARY EDUCATION.<br><br>Defendants. | Civil Action No. 1:26-cv-00503-JJM-AEM |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

After being intentionally and unlawfully targeted by Defendants, Plaintiffs De La Comunidad Bilingual Charter Public School and De La Comunidad Incorporated (collectively "De La Comunidad"), seek a preliminary injunction to prohibit Defendants from enforcing the recently enacted moratorium legislation—which prohibits the approval of new charter public schools for school years 2026-27, 2027-28, and 2028-29 (the "Moratorium Bill")—against De La Comunidad.

De La Comunidad is a bilingual, dual-language K–12 charter public school founded to serve the Latino and multilingual communities of Providence, Pawtucket, and Cranston. Verified Compl. at ¶ 6. After the Rhode Island Department of Education issued a 52-page Request for

Proposals for additional charter school seats, De La Comunidad responded with a detailed 278-page response and application to open a bilingual charter school serving children who are struggling academically. *Id.* at ¶¶ 64, 69. After a lengthy, competitive review process, the Defendant Rhode Island Council on Elementary and Secondary Education (the "Council") approved De La Comunidad's charter application on January 5, 2026, and granted it a preliminary charter. *Id.* at ¶¶ 70-72. In reliance on that approval, De La Comunidad incorporated as a nonprofit, obtained federal tax-exempt status, secured hundreds of thousands of dollars in grant funding, identified a facility, hired leadership, and completed nearly every pre-opening task required for final authorization to operate. *Id.* at ¶¶ 77-112.

Then, the Defendants changed the rules. At the urging of the teachers' unions that had publicly campaigned against De La Comunidad by name, the General Assembly enacted—and Governor McKee signed—a "moratorium" that bars De La Comunidad from obtaining the final approval necessary to operate. *Id.* at ¶¶ 153-181. The Moratorium Bill was "purposely written to prevent De La Comunidad from obtaining its final approval to operate." *Id.* at ¶ 160. Its discriminatory design is confirmed by what it left untouched: the General Assembly amended the bill specifically to preserve state funding for The Greene School's charter expansion—approved the very same day as De La Comunidad's application—while singling De La Comunidad out for exclusion. *Id.* at ¶¶ 164-169.

De La Comunidad is likely to succeed on the merits of its claims that this targeted legislation violates the Contract Clause and the substantive due process guarantee of both the United States and Rhode Island Constitutions. Additionally, De La Comunidad is likely to succeed on its equitable estoppel claim. Absent an injunction, De La Comunidad will lose an entire school year, forfeit the fruits of its substantial reliance, and—most importantly—the children De La

Comunidad was created to serve will be denied the educational opportunity the Council itself approved. The balance of equities and the public interest both favor relief: no legitimate government interest is served by targeting a single approved applicant, while the harm to De La Comunidad and its prospective students is severe and irreparable. Accordingly, the Court should grant a preliminary injunction.

## STATEMENT OF FACTS

### A. Rhode Island Is Failing to Provide High-Quality Public Education to Multilingual Learners and Latino Students

The Rhode Island Department of Education's ("RIDE") Basic Education Program ("BEP") guarantees every child in Rhode Island the right to a high-quality public education, regardless of where they live or which public school (including public charter school) they attend. 200-RICR-20-10-1. However, the available data demonstrates that Rhode Island has fallen short of that promise, particularly for multilingual learners. Verified Compl. at ¶¶ 13-17.

RIDE has expressly recognized that "[a]ll multilingual learners (MLLs) come to our classrooms with tremendous cultural, linguistic, and intellectual resources, along with the right to high-quality education." Rhode Island Department of Education, Multilingual Learners (MLLs)/English Learners (ELs), https://ride.ri.gov/students-families/multilingual-learners-mlls-english-learners-els. RIDE further acknowledges that Rhode Island's educational system bears responsibility for ensuring that multilingual learners receive integrated language instruction, enrichment opportunities, and a whole-child approach to education. *See id*.

As outlined in the Verified Complaint, multilingual learners' academic performance is well below those of their peers in Rhode Island. Verified Compl. at ¶¶ 16-42. De La Comunidad's charter school is specifically focused on providing high-quality multilingual education to Rhode Island students.

3

**B.   The Charter Act and the Approval Process**

The Charter Public School Act of Rhode Island, R.I. Gen. Laws §§ 16-77-1 *et seq.* (the "Charter Act"), establishes the framework governing the creation, authorization, and operation of charter public schools, and the General Assembly directed that its provisions "be interpreted liberally" to advance the mission and diversity of public education.  Verified Compl. at ¶¶ 43-58. The Charter Act requires that the Commissioner of Education "decide on whether or not to recommend the granting of the charter or expansion to the council on elementary and secondary education within ninety (90) days after the conclusion of the public-comment period" that follows the submission of a charter school application.  *Id.* at ¶ 54 (*quoting* R.I. Gen. Laws § 16-77.3-(3)(c)).

Under the Charter School Regulations, 200-RICR-20-05-2 *et seq.* (the "Charter Regulations"), an approved applicant "shall be granted a preliminary charter."  Verified Compl. at ¶ 56.   To then obtain authorization to operate, the applicant must complete an extensive implementation process and obtain "final approval by the Council based on the recommendation of the Commissioner."   *Id.* at ¶ 56.   Notably, the Commissioner may even recommend final approval where the applicant provides "adequate written assurance that all [pre-opening] tasks will be met prior to the opening of the school."  *Id.* at ¶ 76.

The Charter Act and Charter Regulations appear to have a conflict.  The Charter Act requires that the Commissioner of Education "decide on whether or not to recommend the granting of the charter or expansion to the council on elementary and secondary education within ninety (90) days after the conclusion of the public-comment period" that follows the submission of a charter school application.  R.I. Gen. Laws § 16-77.3-(3)(c).  The Charter Act does not provide for

4

a "preliminary charter".  The Charter Act contains the word "preliminary" only once and that is in the following section which was added in by P.L.2010, ch.84, § 5:

> At the time of submission of a proposed charter, the financial records and financial recordkeeping system of the nonprofit organization and the proposed financial plan for the independent charter school shall be reviewed by the auditor general and the auditor general shall, **while the proposed charter is being considered for preliminary approval by the council on elementary and secondary education**, provide an initial determination to the council on elementary and secondary education, the commissioner, and the speaker of the house of representatives and the president of the senate indicating that the auditor general is satisfied that the nonprofit organization is financially responsible.  **Final approval for operation** of the independent charter school shall not be granted by the council on elementary and secondary education until the auditor general has approved the financial plan and financial-record keeping system and is satisfied that the nonprofit organization is financially responsible.

R.I. Gen. Laws § 16-77.3-2(b)(emphasis added).

To the extent that the Charter Regulations are inconsistent with the Charter Act, the Charter Regulations are not enforceable.  *See Chariho Regional School Dist. v. Gist*, 931 A.3d 783 (R.I. 2014).   The Rhode Island Supreme Court has "repeatedly held that '[i]t is a basic tenet of administrative law that the rule-making power of an administrative body may not abrogate state law dealing with the same subject.'  *Reback v. Rhode Island Board of Regents for Elementary and Secondary Education,* 560 A.2d 357, 358 (R.I.1989); *see also Town of Smithfield v. Churchill & Banks Companies, LLC,* 924 A.2d 796, 802 (R.I.2007) (holding that a deadline set forth in a statute "trump[ed]" any administrative regulation because "the general provisions of a legislative rule must give way to specific statutory language")."  *Chariho Regional School Dist.*, 931 A.3d at 791-792.  In the present case, De La Comunidad was an approved applicant under the Charter Act and Charter Regulations.  All that De La Comunidad needed was final approval for operation, which is routinely granted after an approved applicant meets the conditions of its charter approval.

### C.  Historic Practice of RIDE

In practice, the approval of a charter school application results in the issuance of a

preliminary charter, leaving the charter school applicant with a list of items that it must complete to receive final approval to operate.  According to RIDE, final approval to operate is a mere "procedural step" rather than a renewed substantive review of the school's application—and according to the Charter Regulations can be granted based on "adequate written assurance that all [pre-opening] tasks will be met prior to the opening of the school."  *See id.* at ¶¶ 60, 62 (*citing* Council on Elementary and Secondary Education, May 12, 2021 Meeting Minutes at pp.4-5 https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/CESE/Minutes/Minutes_051221_Meeting.pdf?ver=2021-06-04-093946-450; Council on Elementary and Secondary Education, June 19, 2018 Meeting Minutes at p.8; https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/Board-of-Education/Minutes_061918_Meeting.pdf.  For example, in 2018, while presenting three charter schools for final approval to operate, then-RIDE Commissioner Ken Wagner explained that final approval is simply a procedural step that follows a school's successful completion of implementation benchmarks:

> Commissioner Wagner explained that in the regulations for the **process** is for the Council to authorize a charter school in roughly December, and then the school has to meet implementation benchmarks in order to open in the fall.  There is a final **procedural** approval for a school after they have met those benchmarks in the spring.  This is the final **procedural** approval for one of two schools approved in December, Charette, that is slated to open this fall.

Verified Compl. at ¶ 60, *quoting* Council on Elementary and Secondary Education, June 19, 2018 Meeting Minutes at p.8 (emphasis added). https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/Board-of-Education/Minutes_061918_Meeting.pdf.

More recently, Defendant Council's May 12, 2021 Meeting Minutes confirmed the procedural nature of the final approval to operate in the subsection titled "Public Charter Schools

– Authorization to Operate – Final Approval":

> Steve Osborn, RIDE's State Strategy and Student Opportunity Officer, framed the discussion by sharing that this evening's conversation is about the final approval for the charter schools that were brought forward to the Council last December -- Excel Academy Rhode Island; Nuestro Mundo Public Charter School; and Providence Preparatory Charter School.  **He explained that this is a procedural step and is triggered when the schools have met the requirements that are outlined in the Charter School Regulations.**  . . . Mr. Osborn went over the preopening requirements that each of the three schools must meet for final approval.  All three schools met all of the requirements, including securing a school building.

Verified Compl. at ¶ 60, *quoting* Council on Elementary and Secondary Education, May 12, 2021 Meeting Minutes at pp.4-5 (emphasis added). https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/CESE/Minutes/Minutes_051221_Meeting.pdf?ver=2021-06-04-093946-450.

### D.  RIDE's Request for Proposals for New Charter School Student Seats

Consistent with this legal framework, on May 2, 2025, RIDE issued an extensive 52-page Request for Proposals for New Student Seats ("RIDE's RFP").  Verified Compl. at ¶ 64.  RIDE's RFP provided that an "affirmative council vote will serve as preliminary approval," after which "[n]ew charter proposals will then enter a readiness period monitored by RIDE and be brought back to the Council for consideration of final approval in Spring 2026."  Verified Compl. at ¶ 68. As a matter of historic practice, as explained above, final approval has been a "procedural step" that occurs a few months before students arrive, once the school has met the implementation benchmarks. Verified Compl. at ¶¶ 60, 62.

### E.  De La Comunidad's Response to RIDE's RFP and Approval of Charter Application

In July 2025, after nearly six (6) months of work and preparation to respond to RIDE's RFP, De La Comunidad, through its Board of Directors (the "Board") and Application Team (the "Team"), filed a 278-page application with RIDE to operate a K-12 dual-language public charter

school in accordance with R.I. General Law § 16-77-1, *et seq*. and the Charter Regulations. Verified Compl. at ¶ 69 (*citing* De La Comunidad Bilingual Charter Sch., *Application for a Rhode Island Public Charter School* (Aug. 2025), https://ride.ri.gov/sites/g/files/xkgbur806/files/2025-08/DLCBilingualApplication%20%281%29.pdf).  De La Comunidad's application included, but was not limited to: (1) designing the school model in accordance with R.I. Gen. Laws § 16-77-3; (2) identifying a proposed leadership team; (3) engaging the community to assess for need; (4) identifying curriculum models; (5) proposing a plan for educating multilingual learners and differently abled students; (6) designing a budget based on per pupil expenditures of the proposed sending districts; (7) researching and securing a location for the school, and much more. Verified Compl. at ¶ 70.

Commissioner Infante-Green first recommended approval of De La Comunidad's charter in November 2025.  *See* R.I. Dep't of Educ., *Enclosure 5d1: De La Comunidad Bilingual Charter School* (Nov. 18, 2025), https://ride.ri.gov/sites/g/files/xkgbur806/files/2025-11/Encl5d1_DLC.pdf.  The Council then approved De La Comunidad's application for a charter on January 5, 2026, in accordance with Charter Regulation 200-RICR-20-05-2.  *See* R.I. Council on Elementary & Secondary Educ., *Minutes of the Meeting* (Jan. 5, 2026), https://ride.ri.gov/sites/g/files/xkgbur806/files/2026-04/Encl2a_Minutes_0105_Meeting.pdf; Verified Compl. at ¶¶ 71-72.

**F.  De La Comunidad's Substantial Reliance on Approval of Charter School Application**

In reliance on the Council's approval, De La Comunidad undertook the numerous actions in the implementation process that the approval of the charter application and preliminary charter invited. Verified Compl. at ¶¶ 77-112.  Among other things, De La Comunidad incorporated as De La Comunidad Incorporated, obtained 501(c)(3) tax-exempt status and an EIN, filed required

ethics forms, adopted governance and conflict-of-interest policies, submitted financial policies and multi-year budgets, identified a building and prepared a letter of intent, submitted a chief administrator and staffing plan, and developed enrollment procedures—completing most of the pre-opening tasks that can be completed. De La Comunidad also secured substantial conditional funding, including a $667,000 Charter School Program Grant, $215,000 from the New School Venture Fund, $250,000 from the Charter School Growth Fund, and $625,000 from the Rhode Island Education Collective. Verified Compl. at ¶ 112.

There are some preliminary charter conditions that can only be met after De La Comunidad obtains final approval to operate. As pointed out in the Verified Complaint, De La Comunidad is prepared to meet those conditions after it receives its final approval to operate. Verified Compl. at ¶¶ 113-128.

### G. Pawtucket and Cranston Appeal the Approval of De La Comunidad's Charter School Application and Issuance of Preliminary Charter

The Cities of Pawtucket and Cranston understood that the Council had voted to approve De La Comunidad's charter on January 5, 2026. Consequently, Pawtucket and Cranston filed an appeal—in the Rhode Island Superior Court and pursuant to Rhode Island's Administrative Procedures Act—of the Council's approval of the charter. The Cities of Pawtucket and Cranston's appeal is captioned: *City of Pawtucket and City of Cranston v. Council on Elementary and Secondary Education; Commissioner Angelica Infante-Green; De La Comunidad Charter School; De La Comunidad Incorporated; City of Providence*, P.C. 2026-0649 ("Pawtucket and Cranston APA Complaint").

The Cities of Pawtucket and Cranston allege that the Council's **"decision to approve this charter school"** was:

1. In violation of constitutional or statutory provisions;

2.	In excess of the statutory authority of the agency;

3.	Made upon unlawful procedure;

4.	Affected by other error of law;

5.	Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

6.	Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pawtucket and Cranston APA Compl. ¶ 14 (emphasis added) (quoting R.I. Gen. Laws §42-35-15(g)).  The Pawtucket and Cranston APA Complaint is pending in the Rhode Island Superior Court and was recently assigned to Associate Justice Melissa Darigan.  Verified Compl. at ¶¶ 129-132.

### H. The Union Campaign and the Targeted Moratorium

On January 30, 2026—about three weeks after De La Comunidad's approval—the Moratorium Bill (H.7415 / S.2787) was introduced, imposing a moratorium on new charter public schools for school years 2026-27, 2027-28, and 2028-29.  *Id.* at ¶ 153.  The bill was introduced by a legislator "on behalf of the union" and "at the request of" the "union." *Id.* at ¶¶ 154, 156.  As explained in the Verified Complaint, "[t]he legislation was purposely written to prevent De La Comunidad from obtaining its final approval to operate." *Id.* at ¶160.

The Rhode Island Federation of Teachers and Health Professionals ("RIFTHP") and the National Education Association Rhode Island ("NEARI") opposed De La Comunidad.  *Id.* at ¶ 113.  RIFTHP sent out a mailer urging the public to "[t]ell [Governor McKee] to protect our schools" by "[w]ithdrawing his support for the De La Comunidad Bilingual School" and "[s]upporting legislation that puts a moratorium and cap reduction on charter schools (S2787 and H7415)." *Id.* at ¶ 138.  On at least six (6) occasions on social media, the RIFTHP targeted De La Comunidad by name. *Id.* at ¶ 144.

During the 2026 legislative session, the National Education Association Rhode Island ("NEARI") publicly identified a moratorium on charter school expansion as one of its official legislative priorities. *Id.* at ¶ 157. NEARI lobbyists filed lobbying reports indicating that they were lobbying for passage of the Moratorium Bill. *Id.* at ¶146. Defendant Senate President Valarie Lawson is also the President of NEARI. *Id.* at ¶ 145. According to the Senate Journal from June 4, 2026, Defendant Senate President Lawson is recorded as voting yes on 2026-S2787 Sub-A. *Id.* at ¶ 151.

## I. Further Evidence of Targeting of De La Comunidad and Exclusion of The Greene School

The Moratorium Bill's targeting is confirmed by a key amendment. As originally introduced, a funding bar applied to any charter school or expansion "not . . . approved . . . prior to July 1, 2025." *Id.* at ¶ 162. The General Assembly amended that language to turn on "final approval," which preserved state funding for The Greene School's 168-seat expansion—approved on January 5, 2026, the same day as De La Comunidad—while continuing to bar De La Comunidad. *Id.* at ¶¶ 163-165. No charter school other than The Greene School benefitted from this amendment. *Id.* at ¶ 169. A floor amendment that would have allowed De La Comunidad to open was rejected, as was an attempt to address this unfairness by recommitting the legislation to committee. *Id.* at ¶170-172.

## J. Governor McKee was Against a Moratorium Before He Was For It

Governor McKee has been long known as "the father of mayoral charter schools in RI" and, in 2021, opposed a charter school moratorium, stating that it "makes no sense." During his reelection campaign, however, he reversed course and signed the Moratorium Bill on June 18, 2026, two days before the Democratic Party convention.[1] *Id.* at ¶¶ 174-178. The signing

---

[1] Governor McKee sought but failed to obtain the Rhode Island State Democratic Party endorsement but, on July 24,

11

"effectively rescind[ed] De La Comunidad's charter school approval and preliminary charter and stops De La Comunidad from obtaining the final approval to operate." *Id.* at ¶ 179.

### K.  De La Comunidad's Current Legal Status

De La Comunidad has an approved application and preliminary charter status under the Charter Regulations.[2]  Additionally, De La Comunidad has completed almost all of the conditions that it needs to fulfill for final approval to operate.  However, the Moratorium Bill, which specifically targeted De La Comunidad, now purports to prohibit De La Comunidad from opening its charter school over the next three (3) years.  The targeting of De La Comunidad, after it had already received approval of its application and a preliminary charter, is outrageous and unconstitutional.  Without Court action, De La Comunidad and the children it will serve, will continue to suffer irreparable harm.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest." *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 66 (D.R.I. 2025).  The four factors are not weighted equally; "likelihood of success is the main bearing wall of the four-factor framework." *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, 162 F.4th 155, 166 (1st Cir. 2025).  Where,

---

2026, the Rhode Island Federation of Teachers and Health Professionals announced its endorsement of Governor McKee.  Verified Compl. at ¶ 178.

[2] The Charter Regulations provide: "Receipt of this preliminary charter does not imply that the school is prepared to operate or that the Council will grant a final charter to the applicant." 200 RICR 20-05-2.2.4B.  However, Plaintiffs submit that that provision refers to the need to fulfill the requirements of the preliminary charter.  Once the preliminary charter requirements have been satisfied, an approved applicant is entitled to final approval to operate.  In fact, the Charter Regulations even have a safety valve that provides that an approved applicant can obtain final approval to operate "[u]pon successful completion of the tasks or with adequate written assurance that all tasks will be met prior to the opening of the school." 200-RICR-20-05-2.2.4C.

12

as here, the government is the opposing party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, Plaintiffs can prove all four elements and should be granted a preliminary injunction.

## ARGUMENT

I. **DE LA COMUNIDAD IS LIKELY TO SUCCEED ON THE MERITS.**

A. **The Moratorium Bill Substantially Impairs De La Comunidad's Contract in Violation of the Federal and Rhode Island Contract Clauses (Counts I and III of the Verified Complaint).**

As applied to Plaintiffs, the Moratorium Bill violates the Contract Clause of both the United States Constitution and Rhode Island Constitution.  The United States Constitution provides "[n]o State shall...pass any...Law impairing the Obligation of Contracts."  U.S. Const. Art. I, § 10, cl. 1. Similarly, the Rhode Island Constitution states that no "law impairing the obligations of contracts, shall be passed."  R.I. Const. Art. I, § 12.  At its core, the Contract Clause prohibits legislation that substantially impairs contractual obligations without adequate constitutional justification.  *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983); *Cranston Police Retirees Action Comm. v. City of Cranston*, 208 A.3d 557 (R.I. 2019).  Importantly, the Contract Clause applies fully to "public" contracts—i.e., those "to which the state or its agent is a party."  *Nat'l Educ. Ass'n-Rhode Island v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 890 F. Supp. 1143, 1151 (D.R.I. 1995) (hereinafter abbreviated as "*NEA-RI*").

The United States Supreme Court in *Energy Reserves* established a three-part test for determining whether a state law unconstitutionally impairs the obligations of a contract.[3]  First, a

---

[3] Notably, the Rhode Island Supreme Court has adopted the same analysis set forth in *Energy Reserves*.  *See R.I. Depositors Econ. Prot. Corp. v. Brown*, 659 A.2d 95, 106 (R.I. 1995); *R.I. Council 94 v. Carcieri*, 2011 R.I. Super. LEXIS 120, *15 (R.I. Super. Sept. 13, 2011) ("The Rhode Island Supreme Court has used the United States Supreme Court's three-prong analysis for deciding whether a state law unconstitutionally impairs the obligation of contracts as set forth in *Energy Reserves*…").

court determines whether a state law has substantially impaired a contractual relationship. *Id.* If so, it considers whether the state can show a legitimate public purpose behind the challenged law. *Id.* Finally, if a legitimate public purpose is shown, the court considers whether it is sufficient to justify the impairment of the contractual rights. *Id.* In addressing the first prong of the *Energy Reserves* test, a court must ask three questions: (1) does a contract exist; (2) does the law impair a right or obligation under the contract, (3) is the impairment substantial. *Carcieri*, 2011 R.I. Super. LEXIS 120, at \*15. Plaintiffs are likely to satisfy each element of the *Energy Reserves* inquiry.

### 1. A contractual relationship exists.

De La Comunidad's contractual relationship with the State arises from the Charter Act, the Charter Regulations, the Council's formal approval of the application, the issuance of the preliminary charter, the Council's direction that De La Comunidad complete the implementation tasks, and the Council's acceptance of De La Comunidad's continued performance. Verified Compl. at ¶¶ 196-202. This District Court has recognized that a statutory scheme, together with the parties' conduct, can create an enforceable contractual relationship with the State cognizable under the Contract Clause. *NEA-RI*, 890 F. Supp. at 1151-53. Rhode Island law is in accord. *See Carcieri,* 2011 R.I. Super. LEXIS 120, at \*66. When the legislature speaks in terms that unmistakably evidence an intent to exchange binding obligations for performance, the law requires that promise to be honored. *Id.* at \*51-52.

Under the unmistakability doctrine, where the legislature unmistakably manifests an intent to undertake binding obligations, those obligations are entitled to constitutional protection. *Id.*; *Parker v. Wakelin*, 123 F.3d 1, 5 (1st Cir. 1997); *Brennan v. Kirby*, 529 A.2d 633, 638 (R.I. 1987). In applying this doctrine and determining whether the state intended to bind itself, both federal and Rhode Island state courts consider "the language and circumstances of the enactment prior to

amendment or repeal." *Carcieri*, 2011 R.I. Super. LEXIS 120, at \*45; *see United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n.4 (1977) ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."); *Carcieri*, 2011 R.I. Super. LEXIS 120, at \*52 (a litigant may rely "not only the words used [in the statute] but also apparent purpose, context, and any pertinent evidence of actual intent, including legislative history."). Thus, this Court may look to the language and circumstances of the Charter Act, in determining whether the State intended to bind itself through the charter authorization process detailed in the Charter Act and Charter Regulations. Furthermore, intent "can also be demonstrated by circumstances," which "vary from case to case." *Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 173 F.3d 46, 61 (1st Cir. 1999). Here, the Charter Act establishes a comprehensive framework designed to induce qualified applicants to devote substantial time, resources, and effort toward creating innovative public charter schools to further the State's public education commitment. *See generally* R.I. Gen. Laws §§ 16-77-1 *et seq.* Viewed as a whole, the Charter Act's stated purposes, detailed approval process, and implementation checklist reflect the General Assembly's intent that the approval of a charter application, which results pursuant to the Charter Regulations in the issuance of a preliminary charter, carry meaningful legal consequences.[4]

In De La Comunidad's case, pursuant to the Charter Act, the Council approved a specific application, issued a specific preliminary charter, invited De La Comunidad to perform specific conditions, and accepted costly performance in return. Those circumstances evidence a bargained-for relationship, not a mere gratuitous expectation.

---

[4] As pointed out on pages 4-5, the Charter Act does not provide for a "preliminary charter" and in fact only contains the word "preliminary" once.

a)    The Charter Act Purpose and Liberal Interpretation Requirement

The Charter Act begins by declaring the General Assembly's objectives in unmistakable terms. The General Assembly expressly found that charter public schools serve "an ongoing and vital state interest in the improvement of education" and enacted the Charter Act to provide "an alternative within the public education system" by creating opportunities for teachers, parents, students, and community members "to establish and maintain a high performing public school program according to the terms of a charter." R.I. Gen. Laws § 16-77-3.1. The Charter Act further recognizes that charter schools are intended to operate as "vanguards" and "laboratories" for educational innovation, advancing new approaches to curriculum, instruction, governance, parental involvement, and student achievement. *Id.* at § 16-77-3.1(b). Significantly, the General Assembly directed that the Charter Act "be interpreted liberally" to advance these objectives and to promote the mission and diversity of Rhode Island's public education system.[5] *Id.* (emphasis added) ("The provisions of this chapter are to be interpreted liberally to support the purposes set forth in this chapter and to advance a renewed commitment by the state to the mission, goals, and diversity of public education."). Ultimately, these legislative findings are significant because they reveal that the Charter Act was enacted not merely to regulate charter schools, but affirmatively to encourage their creation to advance the State's educational objectives.

b)    Charter Authorization Process

Consistent with those purposes, the Charter Act establishes a comprehensive and highly structured authorization process. Rather than granting the Council unfettered discretion to approve

---

[5] Although courts carefully examine claims that a statute creates binding obligations, the General Assembly expressly instructed that the Charter Act be "interpreted liberally" to advance its stated objectives. R.I. Gen. Laws § 16-77-3.1. That directive counsels against a narrow construction of the Act that would permit the State to induce applicants to undertake the extensive statutory authorization process only to withdraw the promised opportunity for final approval to operate after applicants have complied with the Charter Act's requirements and are working to satisfy the conditions to obtain the approval to operate.

16

or deny applications at will, the General Assembly prescribed detailed statutory requirements governing the authorization process. Applicants must submit an extensive application addressing, among other things, the school's educational program, governance, financial plan, operational structure, enrollment procedures, staffing, facilities, accountability measures, and compliance with state educational standards. *See* R.I. Gen. Laws § 16-77.3-2(a). The Charter Act further requires review by the Commissioner, a public comment period, multiple public hearings, an independent financial review by the Auditor General, and timely consideration by the Defendant Council within 90 days of the close of the public comment period. R.I. Gen. Laws § 16-77.3-2(b); R.I. Gen. Laws § 16-77.3-3(b)-(d).

c)  <u>Approval of Application and Grant of Preliminary Charter</u>

The Charter Act framework becomes even more significant after an applicant successfully completes the substantive approval process and is approved. The Charter Regulations, promulgated by the Commissioner pursuant to their authority under the Charter Act, distinguishes between an applicant seeking approval and one who has already obtained it and expressly provide that "[a]pproved applicants shall be granted a preliminary Charter." 200-RICR-20-05-2.2.4.[6] Receipt of a preliminary charter marks the completion of the State's substantive review and recognizes that the applicant has satisfied the requirements necessary to proceed into the implementation phase.

Although the Charter Regulations explain that a preliminary charter does not itself authorize operation of the school, they likewise make clear that authorization to operate depends upon completion of extensive implementation conditions during the period following the grant of

---

[6] The Charter Act does not provide for a "preliminary charter" and in fact only contains the word "preliminary" once. The Charter Act instead provides a strict timeline for the Commissioner of Education to recommend "the granting of the charter". R.I. Gen. Laws § 16-77.3-(3)(c).

a preliminary charter—or upon "adequate written assurance that all [pre-opening] tasks will be met prior to the opening of the school." 200-RICR-20-05-2.2.4(C). This implementation checklist requires that an approved applicant file articles of incorporation, satisfy financial review, establish governance structures, hire school leadership, develop staffing plans, secure enrollment commitments, and acquire facilities, among numerous additional operational tasks. *Id.* Compliance with these implementation conditions necessarily requires approved applicants, in reliance upon their preliminary charter status, to expend substantial resources prior to being able to open its doors.

It would make little sense to require approved applicants to undertake these substantial obligations if the preliminary charter status carried no meaningful legal significance and the State remained free to retroactively extinguish the approved applicant's ability to complete the authorization process through subsequent legislation. The structure of the Charter Act and Charter Regulations demonstrates the opposite. By creating an approval process culminating in the approval of an application, issuance of a preliminary charter and requiring approved applicants to devote substantial resources toward satisfying implementation conditions, the Charter Act and the Charter Regulations manifest an expectation that approved charter applicants would rely upon the State's statutory and regulatory scheme, and grant of a preliminary charter, in preparing to open their schools.

The District Court can also look at what RIDE's own employees have previously said about the mere "procedural step" of final approval to operate. Former RIDE Commissioner Wagner explained the charter authorization process as providing for: "the Council to authorize a charter school in roughly December, and then the school has to meet implementation benchmarks in order to open in the fall. There is a final **procedural** approval for a school after they have met those

benchmarks in the spring.  This is the final **procedural** approval."  Verified Compl. at ¶ 60 (*quoting* Council on Elementary and Secondary Education, June 19, 2018 Meeting Minutes at p.8 (emphasis                                                                              added).

https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/Board-of-Education/Minutes_061918_Meeting.pdf).

More recently, the Council's May 12, 2021 Meeting Minutes confirmed the procedural nature of the final approval to operate in the Meeting Minutes subsection titled "Public Charter Schools – Authorization to Operate – Final Approval":

> Steve Osborn, RIDE's State Strategy and Student Opportunity Officer, framed the discussion by sharing that this evening's conversation is about the final approval for the charter schools that were brought forward to the Council last December -- Excel Academy Rhode Island; Nuestro Mundo Public Charter School; and Providence Preparatory Charter School.  **He explained that this is a procedural step and is triggered when the schools have met the requirements that are outlined in the Charter School Regulations.** . . . Mr. Osborn went over the preopening requirements that each of the three schools must meet for final approval.  All three schools met all of the requirements, including securing a school building.

Verified Compl. at ¶ 60 (*quoting* Council on Elementary and Secondary Education, May 12, 2021 Meeting            Minutes            at            pp.4-5            (emphasis            added).

https://ride.ri.gov/sites/g/files/xkgbur806/files/Portals/0/Uploads/Documents/CESE/Minutes/Minutes_051221_Meeting.pdf?ver=2021-06-04-093946-450).

When viewed in its entirety, the Charter Act and Charter Regulations—their language, declared purposes, comprehensive authorization process, implementation conditions, and recognition of approved applicants as a distinct legal status of a preliminary charter—demonstrate the very "language and circumstances" that courts examine in determining whether the legislature intended to undertake binding obligations.  *See United States Trust Co.*, 431 U.S. at 17 n.4;

*Carcieri*, 2011 R.I. Super. LEXIS 120, at *45–52.[7]  At a minimum, Plaintiffs have demonstrated a substantial likelihood that the Charter Act was intended to create enforceable rights once an applicant successfully completed the statutory approval process and received a preliminary charter under the Charter Regulations.

Here, the Charter Act and the surrounding circumstances gave rise to a binding implied unilateral contract between Plaintiffs and the Council.  Under federal and Rhode Island law, once a court determines that the legislature intended to create contractual obligations, the existence of an implied unilateral contract is analyzed under ordinary principles of contract law.  *NEA-RI*, 890 F. Supp. at 1156; *Carcieri*, 2011 R.I. Super. LEXIS 120, at *51-52.  Specifically, the court considers whether: (1) whether the state offered to enter into a contract; (2) whether the plaintiff accepted that offer through the performance requested by the state; and (3) whether the agreement is supported by consideration.  *Carcieri*, 2011 R.I. Super. LEXIS 120, at *55-56. (citing Restatement (Second) of Contracts § 22, 71 (1981)).  Because a unilateral contract contemplates a promise in exchange for performance, rather than a return promise, the offer becomes irrevocable once the offeree has rendered substantial performance in response to the offer.  *Id.* at *59 (citing Restatement (First) of Contracts § 45 (1932)).

---

[7] In *NEA-RI*, the U.S. District Court of Rhode Island found that a Rhode Island statute—which allowed certain employees of teachers' unions to participate in the Rhode Island public employee retirement system—constituted an offer to contract because the state "induced" the employees to contribute money to the system in order to receive future benefits and "the statute express[ed] a clear indication by the State that plaintiffs should be allowed to enter the Retirement System, so long as plaintiffs agreed to the State's terms." *Id*; *see also id.* ("Since those legislators offered plaintiffs the opportunity to voluntarily participate in and contribute to the Retirement System, their legislation constituted an offer.").  Similarly, in *Carcieri*, the Rhode Island court found that pension legislation "constituted offers" intended to "induce people to enter public employment and continue in that employment over a substantial period of time." 2011 R.I. Super. LEXIS 120, at *57; *see also id.* ("If one major purpose of public pensions is to induce people to enter into public employment and to maintain that employment, then certainly the General Assembly intended the ERSRI to constitute an offer inviting acceptance as defined by the ERSRI's retirement eligibility terms.").

20

In De La Comunidad's case, RIDE issued a 52-page Request for Proposals seeking charter school applicants. Verified Compl. at ¶ 64. RIDE's RFP provided that an "affirmative council vote will serve as preliminary approval," after which "[n]ew charter proposals will then enter a readiness period monitored by RIDE and be brought back to the Council for consideration of final approval in Spring 2026." *Id.* at ¶ 68. As a matter of historic practice, as explained above, final approval has been a "procedural step" that occurs a few months before students arrive, once the school has met the implementation benchmarks. *Id.* at ¶¶ 60, 62. De La Comunidad responded to RIDE's RFP with a 278-page application and subsequently received approval of its application and a preliminary charter. *Id.* at ¶ 69. Moreover, De La Comunidad has gone through extensive steps in the "readiness period" which certainly would qualify as consideration. *Id.* at ¶¶ 113-128; *see Carcieri*, 2011 R.I. Super. LEXIS 120, at *60–62 (consideration exists where each party undertakes legal obligations or confers a benefit upon the other in exchange for the promised performance). There is a contract between De La Comunidad and the Council.[8]

### 2.    The Moratorium Bill impairs De La Comunidad's and Defendant Council's contractual relationship, and the impairment is substantial.

Once a contractual relationship is established, the Court must determine whether the challenged legislation substantially impairs that relationship. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983); *R.I. Depositors Econ. Prot. Corp. v. Brown*, 659 A.2d 95, 106 (R.I. 1995). Here, there can be little dispute that the Moratorium Bill substantially impairs Plaintiffs' contractual rights. The impairment to Plaintiffs is not minimal; it extinguishes the central benefit that the Charter Act and Charter Regulations promised in exchange

---

[8] De La Comunidad also points to the Pawtucket and Cranston APA Complaint which explicitly challenged the Council's "decision to approve this charter school". Verified Compl. at ¶¶ 129-132.

for Plaintiffs' performance—the ability to receive final approval to operate De La Comunidad in the 2027-2028 academic year as Plaintiffs originally planned.

The Contract Clause protects parties from precisely this type of legislative action. As the District Court recognized in *NEA-RI*, once plaintiffs had accepted the State's statutory offer and entered the contractual relationship, legislation that revoked the very benefits they had earned constituted a substantial impairment of their contractual rights.  890 F. Supp. at 1162.  The court held that the legislation "obviously" substantially impaired the plaintiffs' contractual relationship because it "totally extinguishe[d] all of the retirement benefits that the individual plaintiffs acquired" and upon which they had relied, describing the statute as the "paradigm of 'substantial impairment.'"  *Id.*

Here, the Moratorium Bill prohibits the Council from granting final approval for the creation of expansion of charter schools slated to open in the 2026-2027, 2027-2028, or 2028-2029 school years.  While, in theory, the Moratorium Bill does not prohibit the Council from granting DLC the ability to open in the 2029-2030 school year, courts have found that delays in a party's ability to receive its contractual benefits still constitutes a substantial impairment.  *See Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766, 772 (2d Cir. 1991) ("substantial impairment" when the state delays the payment of ten days salary to certain state employees during a fiscal crisis and promised to pay salary at later date).  Moreover, "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Rsrvs. Grp.*, 459 U.S. at 411.

The Moratorium Bill "nullif[ies] Plaintiffs' approved status and preliminary charter" and prevents De La Comunidad "from obtaining final authorization to operate."  Verified Compl. at ¶¶ 204, 206.  The impairment "extinguishes the principal benefit" of the relationship "after Plaintiffs

22

had already completed nearly all implementation requirements and invested significant time, labor, and financial resources in reliance upon the Council's approval." *Id.* at ¶ 206.  This is a substantial impairment.

### 3.    The Moratorium Bill's impairment is neither reasonable nor necessary.

Because the State itself is the contracting party, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Cranston Police Retirees Action Comm. v. City of Cranston*, 208 A.3d 557, 574 (R.I. 2019).  Courts must scrutinize the State's asserted purpose "with an extra measure of vigilance," and the impairment can be sustained "only if . . . both reasonable and necessary." *Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 173 F.3d 46, 60 (1st Cir. 1999); *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1 (1977).  The State cannot "balance[] away" the Contract Clause by invoking a preferred use for public funds.  *U.S. Tr. Co. of New York*, 431 U.S. at 29.  A "significant and legitimate public purpose" must remedy "a broad and general social or economic problem" and "may not be simply the financial benefit of the sovereign," nor a device "providing a benefit to special interests." *Cranston Police Retirees Action Comm*, 208 A.3d at 576; *Energy Rsrvs. Grp.*, 459 U.S. at 412.

The State's proffered fiscal rationale collapses on the face of the legislation.[9]  The General Assembly "expressly carved out an exception . . . that allowed The Greene School to access state

---

[9] Several members of the General Assembly have rejected the State's stated purpose, noting that the Moratorium will not fix funding inequities.  *See* Rep. Joshua J. Giraldo, Rep. Giraldo Opposes Legislation Limiting Charter Public School Opportunities, R.I. Gen. Assemb. (May 7, 2026), https://rilegislature.gov/pressrelease/_layouts/RIL.PressRelease.ListStructure/Forms/DisplayForm.aspx?ID=376431&List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&Web=2bab1515-0dcc-4176-a2f8-8d4beebdf488 ("This bill does not address the real challenges in our education system. It does not fix funding inequities. It simply takes options away from families, particularly those without the means to seek alternatives.").  Representative Leonela Felix pointed out on the House Floor: "The only school that is getting impacted [is a] school that would have served primarily Black and brown folks in our communities, our students who need it the most."  R.I. Capitol Television, *Senate Calendar* (June 10, 2026), Capitol TV Rhode Island, https://capitoltvri.cablecast.tv/show/12335?site=1&query=7415 (starting at 1:25:31).

23

funding for its charter expansion during the Moratorium period," even though The Greene School's expansion was approved the same day as De La Comunidad's and would add seats during the moratorium.  Verified Compl. at ¶¶ 164-169, 188.  A statute that exempts a favored party while burdening a single disfavored applicant is not a good-faith response to a general fiscal problem. The Moratorium Bill "was targeted to stop De La Comunidad and strip [it] of its right to obtain approval to open."  *Id.* at ¶ 207.

For all the foregoing reasons, De La Comunidad is likely to succeed on Counts I and III of the Verified Complaint.

### B. <u>The Moratorium Bill Violates Substantive Due Process (Counts II and IV of the Verified Complaint).</u>

The Fourteenth Amendment of the United States Constitution and Article I of the Rhode Island Constitution forbid the State to deprive any person of property without due process of law. U.S. Const. Amend. XIV; R.I. Const. Art. I, § 2.  To prevail, De La Comunidad must show a deprivation of a protected property interest and government action that "shocks the conscience." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008).  The Rhode Island standard is materially the same: substantive due process "prevents the use of governmental power for purposes of oppression, . . . or legally irrational action that is not keyed to a legitimate state interest," and a regulation offends it if "arbitrary, discriminatory, or irrelevant to a legislative policy."  *L.A. Ray Realty v. Town Council of Town of Cumberland*, 698 A.2d 202, 211 (R.I. 1997).  In cases of legislation that "retroactive[ly]…overturn[s] vested property rights, such laws are subject to a "special scrutiny."  *Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022); *see Adams Nursing Home, Inc. v. Mathews*, 548 F.2d 1077, 1080 (1st Cir. 1977) (identifying cases finding retrospective acts invalid because they overturned "vested property rights" and noting that "laws that unsettle settled rights can be harsh, and [] deserve [] special scrutiny").

24

### 1.  Protected property interest.

"[T]he predicate to a property interest is a legitimate claim of entitlement under state law," and "contractual rights are property interests under the due process clause." *NEA-RI*, 890 F. Supp. at 1164.  A "tangible interest . . . sufficient to invoke the general constitutional protection against arbitrary and irrational government action" suffices.  *Id.*  De La Comunidad's approved application, its status as a preliminary charter holder, and its legitimate expectation of completing the authorization process under the framework in place when it applied, are such interests.  Verified Compl. at ¶ 215.  The Rhode Island Supreme Court has held that an applicant who has satisfied all valid approval criteria acquires a constitutionally protected property interest in approval.  *See L.A. Ray Realty*, 698 A.2d at 208-210.

There is no doubt that the Moratorium Bill has deprived De La Comunidad of their protected property interest.  De La Comunidad is now prohibited from opening its charter school for at least the next three (3) years.

### 2.  Conscience-shocking, targeted action.

This case bears little resemblance to the ordinary land-use or licensing disputes in which substantive due process claims typically arise.  Plaintiffs did not simply submit an application that was denied.  At the State's invitation and in response to RIDE's RFP, Plaintiffs undertook the years-long process of establishing a charter public school, satisfied every statutory and regulatory requirement for approval of its application, received a preliminary charter from the Council, and entered the final implementation stage.  Only then did the State enact legislation (introduced at the union's request and accompanied by an amendment crafted to spare another charter school) specifically designed to prevent Plaintiffs—and Plaintiffs alone—from obtaining final approval to operate.  That deliberate course of action "shocks the conscience."

The undisputed facts demonstrate a deliberate course of government conduct. RIDE publicly acknowledged that too many students—and particularly multilingual learners—were failing to meet educational expectations. Verified Compl. ¶¶ 16–42. To address those deficiencies, RIDE issued a 52-page RFP looking to expand the number of charter seats available to students. *Id.* at ¶ 64. De La Comunidad responded with a 278-page application, participated in the public hearing and comment process, obtained the Commissioner's recommendation for approval, and ultimately was approved by the Council. *Id.* at ¶¶ 69-74. 2. De La Comunidad then entered a "readiness period monitored by RIDE" and continued satisfying implementation conditions in anticipation of final approval to operate. *Id.* at ¶¶ 73-74, 197.

Unable to prevent Plaintiffs from obtaining approval through the established statutory process, the teachers' unions instead sought legislative intervention—the adoption of a retroactive moratorium that would disproportionately impact De La Comunidad. *Id.* at ¶¶ 133, 138-139, 141-145. It is worth noting that the teachers' unions have a unique (and likely unethical) advantage: Senate President Lawson simultaneously served as President of NEARI, an organization that publicly lists as a legislative priority the passage of the Moratorium Bill. *Id.* at ¶¶ 145, 157. As Senate President, she also served as the "presiding officer of the 38-member Chamber," "oversees the proceedings of the Senate," "decides all questions of order," "declares votes," and "appoints all standing committees." Senate Leadership, R.I. Gen. Assembly, https://rilegislature.gov/Pages/SenateLeadership.aspx (last visited Aug. 3, 2026).

Defendant Senate President was also lobbied on education by the RIFTHP President. During the same legislative session, NEARI lobbyists were lobbying for passage of the Moratorium Bill. RIFTHP also conducted a public campaign aimed directly at De la Comunidad and attacked De La Comunidad through a mailer, on social media and with a press release. *Id.* at

¶¶ 138-139.  On at least six (6) occasions, RIFTHP called De La Comunidad, a bilingual school, an "illegal charter expansion."  *Id.* at ¶ 144.  Meanwhile, the General Assembly was careful to carve out an exception so that The Greene School was not impacted by the Moratorium Bill.  *Id.* at ¶¶ 164-165, 188.  To the surprise of no one, the Senate President voted in favor of the Moratorium Bill and the Senate followed her lead (after rejecting attempts to amend the Moratorium Bill to spare De La Comunidad).  *Id.* at ¶¶ 151, 170-171.

Additionally, Defendant Governor McKee, who in 2021 said that a moratorium "makes no sense," completely reversed himself in the middle of his reelection campaign and signed the Moratorium Bill three (3) days before the Rhode Island State Democratic Party Convention.  *Id.* at ¶¶ 176, 178.  The Rhode Island Democrats, though, denied Governor McKee the endorsement he sought.  *Id.*

At the end of it all, De La Comunidad was stripped of its preliminary charter and the opportunity to operate a charter school, and children of Rhode Island are left waiting.  Taken together, these facts shock the conscience.  After inviting Plaintiffs to undertake the extraordinary task of creating a public charter school, guiding them through a comprehensive approval process, approving the charter school application, granting Plaintiffs a preliminary charter, and requiring months of implementation work, Defendants deliberately changed the governing rules for the purpose of preventing Plaintiffs from completing the process. They simultaneously crafted exceptions for others while refusing similar relief for Plaintiffs. Such arbitrary and targeted governmental action is precisely the type of executive and legislative abuse that substantive due process forbids.

The Rhode Island Supreme Court has found a substantive due process violation on comparable facts where officials "acted egregiously, as well as with animus, and without actual or

27

legal basis," pursuing a single party "to the exclusion of all others." *L.A. Ray*, 698 A.2d at 213; *see also Boscher*, 514 F.3d at 113 (explaining that substantive due process "may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations," and a "run-of-the-mill land-use case" does not shock the conscience absent "fundamental procedural irregularity, racial animus, or the like."). Legislation that singles out one identified applicant for exclusion—while carving out a similar party—is "arbitrary, discriminatory," and "not keyed to a legitimate state interest." *L.A. Ray Realty*, 698 A.2d at 211.

De La Comunidad is likely to succeed on Counts II and IV of the Verified Complaint.

## C. Equitable Estoppel Independently Supports Relief (Count V of the Verified Complaint).

De La Comunidad's likelihood of success is reinforced by its equitable estoppel claim. The Council, acting within its lawful authority, approved De La Comunidad's application and induced it to incur substantial obligations and expenditures in reliance, satisfying the elements of an affirmative representation and detrimental reliance. Verified Compl. at ¶¶ 251-267. Because likelihood of success on the constitutional claims is established, the Court need not resolve the estoppel theory to grant relief, but equitable estoppel provides an additional, independent basis.

The Rhode Island Supreme Court has applied the doctrine of equitable estoppel against administrative and municipal authorities under circumstances where justice would so require. *Greenwich Bay Yacht Basic Assocs. v. Brown*, 537 A.2d 988, 991 (R.I. 1988). Under Rhode Island law, a party that obtains a lawfully issued government approval for a then-permitted activity, and that in good-faith reliance on that approval incurs substantial obligations or expenditures, acquires an equitable right that is immune from impairment or revocation by a subsequently enacted change in the law. *Shalvey v. Zoning Bd. of Review*, 99 R.I. 692, 699-700 (R.I. 1965); *Greenwich Bay Yacht Basic Assocs. v. Brown*, 537 A.2d 988, 992 (R.I. 1988).

28

The Moratorium Bill targeted De La Comunidad after De La Comunidad followed the regulatory process and received approval of its application and a preliminary charter. Final approval to operate was simply a procedural step as explained by RIDE officials through the years. Moreover, De La Comunidad has already substantially completed the conditions that the preliminary charter required for operation. De La Comunidad **reasonably relied on the statutory and regulatory framework then in effect**. *Raymond v. Jenard,* 120 R.I. 634, 639 (R.I. 1978) (emphasis added). The retroactive effect is especially unfair here because Plaintiffs' reliance was reasonable and substantial.

The Rhode Island Supreme Court has applied the doctrine of equitable estoppel against administrative and municipal authorities under circumstances where justice would so require. *See Brown*, 537 A.2d at 991. The targeting of a charter school, after it has followed the Charter Act and Charter Regulations, is outrageous and the Defendants should not be allowed to enforce the Moratorium Bill against De La Comunidad. Justice requires that Defendants be stopped from enforcing the Moratorium Bill against De La Comunidad.

De La Comunidad is likely to succeed on Count V of the Verified Complaint.

## II.    DE LA COMUNIDAD WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

De La Comunidad must show that "irreparable injury is likely in the absence of an injunction," with the predicted harm and the likelihood of success "juxtaposed and weighed in tandem." *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 71 (D.R.I. 2025). That showing is met here. The deprivation of constitutional rights, even for a minimal period of time, constitutes irreparable harm as a matter of law. *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (explaining that "deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S.

29

347, 373 (1976)).  If the Moratorium Bill is enforced, De La Comunidad cannot open, cannot complete the authorization process it has substantially performed, and loses the value of its reliance—including grant funding, a secured facility, and assembled leadership and staff.  Verified Compl. at ¶¶ 266, 270.  These losses cannot be remedied by damages.  The lost school year and the forfeited educational opportunity for the children De La Comunidad was created to serve are, by their nature, unrecoverable.  *Id.* at ¶ 190.  As alleged in the Verified Complaint, De La Comunidad "will suffer irreparable harm by not being able to open [its] charter and serve children who are performing well below average in statewide educational assessments and need education alternatives," and De La Comunidad "has no adequate remedy at law."  *Id.* at ¶¶ 267, 270.

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

Because Defendants are government officers and a state agency, the balance-of-equities and public-interest factors merge.  *Bondi*, 794 F. Supp. 3d at 72.  The balance of the equities and the public interest favor De La Comunidad.  De La Comunidad is facing the loss of a fully approved school, the forfeiture of reliance investments, and the denial of educational opportunity to Latino and multilingual students who are already underserved.  Verified Compl. at ¶¶ 270-271.  Against that, Defendants suffer no cognizable hardship from being required to honor an approval Defendant Council itself granted and to permit De La Comunidad to complete a process the Council invited.  An injunction preserving the *status quo ante* imposes no burden the State did not already accept when it approved the charter school application.

The public interest points the same way.  It is always in the public interest to prevent the violation of a party's constitutional rights, and no legitimate public interest is served by "targeting an individual applicant."  Verified Compl. at ¶ 272; *see also Gonzalez v. Gor*, 802 F. Supp. 3d 368, 390 (D.P.R. 2025) (noting an "obvious public interest" in ensuring that government actors

follow the law); *Nat'l Parks Conservation Ass'n v. United States DOI*, 2026 U.S. Dist. LEXIS 131325, *88 (D. Mass June 12, 2026) (finding that "preliminary injunctive relief would serve the public interest by forcing Defendants to abide by their existing statutory duties.").   Enjoining enforcement of a statute that singles out one approved school—while sparing a similar school approved on the same day—vindicates both the constitutional guarantees at issue and the State's own declared policy of expanding high-quality educational opportunity.  Verified Compl. at ¶¶ 44-46.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a preliminary injunction[10]:

1.  Enjoining Defendants, during the pendency of this action, from enforcing the Moratorium Bill against De La Comunidad and from revoking, impairing, or refusing to honor De La Comunidad's preliminary charter;

2.  Ordering Defendants to permit De La Comunidad to complete the charter-authorization process and to grant final approval to operate upon De La Comunidad's satisfaction of its conditions; and

3.  Granting such other and further relief as the Court deems just and proper.

[SIGNATURE PAGE FOLLOWS]

---

[10] No security should be required because Defendants are officers and an agency of the State. Fed. R. Civ. P. 65(c).

DATED: August 13, 2026

Respectfully submitted,

DE LA COMUNIDAD BILINGUAL CHARTER PUBLIC SCHOOL, and DE LA COMUNIDAD INCORPORATED,

By their attorneys,

*/s/ Angel Taveras*
Angel Taveras (#5552)
**TAVERAS LAW, P.C.**
100 Westminster Street, 11th Floor
Providence, Rhode Island 02903
(401) 580-9912 (telephone)
(401) 327-5656 (facsimile)
ataveras@taveraslaw.com

and

*/s/ Stephanie Gonzalez*
*/s/ Crystal D. Peralta*
Stephanie Gonzalez (#10643)
Crystal D. Peralta (#10266)
**GP LAW AND CONSULTING, LLC**
383 West Fountain Street, Suite 101
Providence, Rhode Island 02903
(401) 859-3432 (telephone)
stephanie@gplawri.com
crystal@gplawri.com